Judge Carr,
delivered his opinion:
In the latter part of the year 1788, or beginning of 1789, Christopher Hudson died, leaving, as it. seems, a large fcnlnne, and six children, Charles, William C.,Lewellyn, Francis E., Elisabeth and Mary. By his will, he divided his land among his sons, gave a good many specific legacies, and directed that the residue of the personalty, after payment of debts, be divided equally among his wife and children, taking into consideration what Elisabeth and Mary had already received. His sons William and Charles, with others, are appointed executors. Charles alone qualified. At the death of their father, all the children were of age, except Francis, and he was very near it. Elisabeth had received, in the life of her father, her full share of his estate, as appears by the answer of herself and husband, disclaiming all interest. All the children, therefore, at all interested in the settlement of the estate, were, very shortly after the executor began to act, of full age and sui juris. At the death of the old man, W. C. Hudson had in his possession ten slaves, which it seems had been given him by his father, and a deed made for them; but which, at the making of his father’s will he had agreed to give up, and take his portion under the will.
In 1789, the executor brought an action of detinue against W. C. Hudson, claiming eight of these slaves; which suit, in April, 1790, was discontinued; W. C. Hudson giving up to the executor, five of the slaves, and retaining the others. About the same time, the executor, having quieted the creditors, distributed the rest of the slaves among the children. There was never any formal or regular settlement; because, as the executor states, the children being all of age and assenting, it was not thought worth while to obtain orders of Court for every step taken in the business. In this state, things remained. TV. C. Hudson held during his life, the slaves which he had received from his father, and retained on the compro *119 mise of the action of detinue. He died in 1800, twelve years after his father. The slaves descended to his representatives, and have ever since been treated as a part of his estate. During his life, he was satisfied with his portion, and never attempted a further settlement, or made any other claim. The other children also, Mary, Elisabeth, Lewellyn and Francis, were all contented with their shares, and perfectly satisfied with things as they stood. In 1807, nineteen years after the old man’s death, and fifteen or sixteen after the distribution made by the executor, the widow, administrator and children of W. C. Hudson, issue a subpoena in Chancery, and in 1810, filed a bill, calling for a general settlement of the estate of Christopher Hudson, and claiming the five slaves, which W. C. Hudson had, in 1700, given up to the executor, as the property of his father’s estate. To this bill, the executor and surviving children of Christopher Hudson, are made defendants. They all answer, some relying on the statute of limitations; all denying, positively, that W. C. Hudson had the least shadow of title to the five slaves; all insisting, that he had received a full portion of his father’s estate; that the whole matter was fairly settled; every body satisfied with it; and that it ought not, after such a lapse of time, to bo disturbed. And here, in my mind, an end should have been put to the whole business; the Chancellor dismissing the bill at the costs of the plaintiffs. That they had not the semblance even, of a claim to the five slaves, is most evident; for, they originally belonged to the old man’s estate; were given up to the executor, as his property, by W. C. Hudson, seventeen years before suit brought, and were never claimed by him. afterwards, though lie lived till 1800. That the estate had been finally settled and distributed, there was the strongest ground to presume, from the long acquiescence of all the parlies interested; all, too, fully capable of acting for themselves, and protecting their own interests. This acquiescence had settled all matters; and quieta moveré was never the maxim of a *120 Court of Equity. ' The result, too, has shewn, that the presumpt¡on was well founded; for, on the account, the executor has shewn a fair disbursement, and stands as a creditor. Instead of dismissing the bill, on the coming in of the answers, the parties were sent before the commissioners. Reports and re-commitments followed in long succession. A cross-bill was filed; and finally, a decree was rendered against the plaintiffs, in the original bill, for five slaves, three of them women, and all their increase, (we do not know how many); and also, for $3210 12, in money, made up. of the hires of the slaves for the last twenty years, together with the prices of some sold, and one dead. Upon such a basis, who would have dreamed of this stupendous superstructure ? Surely none of the parties, if we may draw conclusions from their statements on oath, or their actions. The cross-bill itself does not seem, to me, to claim the slaves retained by W. C. Hudson, on the compromise, as the property of the estate, improperly withheld by him, but merely as property which he had received with the assent of the executor, and which he ought to bring into hotchpot before he could claim a share of the residue of the estáte. It claims «either increase, nor hire of the slaves; and we know that, on the doctrine of hotehpot, neither could be claimed. On this same doctrine, too, the party called on to have his advancement brought into hotchpot, may elect whether he will do it, or have his bill dismissed for his refusal. But here, without giving the plaintiffs such election, a decree is rendered against them for the whole advancement their ancestor had received, with the increase and hire of the negroes for 20 years, the price of some sold, and of one who had died. Surely this canpot be right. I have said, that the cross-bill did not, in my mind, lay a positive claim to, and , seek an absolute decree for, the slaves in the possession of the representatives of W. C. Hudson. But, if it should be considered to do so, then it ought not to have been sustained; for, the plaintiffs, in the cross-bill, do most clearly *121 admit, in their answers to the original bill, that these slaves were the property of W. C. Hudson. Nay, some of them (Francis and Mary) expressly name the individual slaves, and aver that they belonged to the estate of TV. C. Hudson, and had been received by him from his father’s estate; and the executor, too, slates, that they were held by him as his portion of his father’s estate, and so states it as to shew that this was with his assent. Now, it is settled law, laid down by Lord Hardwiclee, and never, I believe, stirred since, (2 Ves. 529,) that a party shall not question, in his cross-bill, what he has admitted in his answer; and upon the strongest reason; for, the answer being upon oath, it could never be endured, that in the same Court, in the same proceeding, the same party should set up a claim, in direct conflict with that oath.
Upon the whole, my opinion is, that the decree be reversed, and both bills dismissed, at the costs of the plaintiffs in the original bill.
Judges Green and Coalter, concurred in a decree, entered in pursuance of the foregoing opinion. *

 Judges Bbookb and Gabem, absent.